UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
CIVIL DIVISION
------------------------------------------------------------X
DAVID GROSSMAN & ASSOCIATES PLLC,      AFFIRMATION IN OPPOSITION
and DANK CAPITAL SAPI DE CV.

    2:23-cv-08231-NJC-LGD

                   Plaintiffs,

   -v-

KERNAN AND ASSOCIATES LAW GROUP,

                 Defendant.
------------------------------------------------------------X

David Grossman, an attorney authorized to practice law in New York, affirms the following under the penalties of Perjury:

1. This Affirmation is based upon the contents of the file in the deponent's office and upon information and belief as well as your affiant's personal knowledge as will be detailed herein.
2. The instant Affirmation is respectfully submitted in opposition to. Defendant's 12(b)(6) pre-answer motion to dismiss. The motion should be denied for the reasons detailed in the accompanying Memorandum of Law which establishes material questions of law and fact exist rendering dismissal inappropriate in this case.
3. Defendant argues confusingly there are no agreements between the parties. This is untrue.
4. As detailed below, and in the other attachments, there were multiple written agreements entered into between the parties which support denying Defendant's motion.
5. In fact, all the Contracts ironically which Defendant challenges were drafted by Defendant. As such any ambiguity in them should be interpreted against the drafter - Defendant. Indus. Window Corp. v. Fed. Ins. Co., 565 F. Supp. 2d 513 (Southern District New York (July 16, 2008) ("*Contra Preferentem* – Any contract ambiguity must be interpreted against the drafter).
6. Notably my office had never transacted for bitcoin prior to the purchase here. I had been introduced to my client in a prior potential transaction which did not conclude and was asked if I might like to work together in the future if they had a need. Just prior to the transaction starting I was contacted by co-plaintiff Dank and asked if my office could process the escrow for a purchase Defendant who I was told was a seasoned bitcoin attorney.
7. The problem at that time was I was travelling in Oman and the UAE on business with limited internet access at times. Everyone agreed the transaction was extremely simple

and this would not be a problem, so I agreed. Also, I was promised Defendant would take lead on all transactional paperwork and that sounded just perfect.

8. Dank had been speaking with Defendant for some time along with another attorney from Spain who was working with Defendant, Henry Caballero.
9. Defendant prepared an informative illustration summarizing the agreement and proposed plan of the parties and confirmed the deal procedure and the fact the purchase would be for an initial 250 bitcoins, which approximates ten million USD:



Friday, November 9, 2023
1. Test for: $11.23 or else requested from client.
2. Buyer will provide full KYC, AML and CIS directly to PK before the transfer for approval.
3. Buyer to transfer funds into PK Escrow Account within 48hrs after A2B test.
4. After clearance of the escrow funds, PK and DG move to signing a Joint Escrow Agreement.
5. Funds moves to DG, and DG confirms to EO.
6. EO deliver BTC to PK.
7. PK and DG execute the SWAP.
8. Edu to send fees and discount to PK for distribution.

10. Defendant was very organized and really wanted to make sure the agreement was clear for everyone. Defendant then sent it over in excel with a reconfirmation referencing the planned escrow agreement with the linked wallets and full details:



11. Had things gone proper the larger plan was also agreed to and confirmed again by Defendant in writing:

| Wallet Balance | Test Type | Buyer code | Country | Satoshi Receiving Wallet | PAYMENT | AMOUNT | Payment Form |
|---|---|---|---|---|---|---|---|
| ฿ 5,000 | direct | SWISS1 | SWISS | | DIRECT TO SELLER | $ 150,000,000.00 | FIAT |
| | A to B | GERMAN1 | DE | | Payment via Escrow | $ 150,000,000.00 | FIAT |
| | A to B | PANAM1 | PA | | Payment via Escrow | $ 70,000,000.00 | USDT |
| | A to B | LELEY1 | US | | Payment via Escrow | $ 150,000,000.00 | FIAT |
| ฿ 250 | Direct | LISA1 | US | | DIRECT TO SELLER | $ 7,800,000.00 | |
| FOR EXECUTING THIS PLAN, WE NEED 2 SATOSHIS | | | | | DIRECT PAYMENTS | $ 157,800,000.00 | |
| | | | | | FUNDS IN ESCROW | $ 370,000,000.00 | |

12. According to Dank the parties agreed and planned to flow seamlessly into these successive tranches, but obviously that will not be happening.

### *CONTRACT ONE (Exhibit A)*

13. After sorting out all details which Defendant captured in a written Agreement, drafted exclusively by Defendant, it was then circulated by docusign by Defendant. A copy of *CONTRACT ONE* is attached at Exhibit A. This is a crucial Exhibit as it details and corroborates Plaintiffs' claims. Some of the key issues in this agreement worth highlighting are:
    a. WHO IS THE BUYER?
        i. This agreement states the buyer is "Mohammad Akram of GOH Asia Pte" at page 5.
        ii. We were given a full informational package for KYC and AML for this same buyer. Exhibit B.
        iii. In paragraph 16 of the contract which Defendant prepared I was entitled to whatever documents I required which obviously included AML and KYC information for the buyer. Also on page one in the section titled procedures the Agreement stated I was to be given AML and KYC.
        iv. The problem is the information I was given was completely inconsistent with what Defendant tells this Court at paragraph 5 of the pending motion. The plaintiffs were told the buyer was GOH Asia Pte and we relied upon these representations when conducting due diligence in this transaction.
        v. Defendant writes something very different in Court - stating "I first became involved in the transaction at issue when I signed an escrow agreement with a buyer, Mr. Saman Pazooki of Zodick Trading Solutions LLC, a company based in Sterling, Virginia, so that buyer could purchase bitcoin. The buyer was introduced to me several months before and I met with him in person in Washington, DC. He discussed that he had funds

      from other commodity transactions such as jet fuel and investor funds that he wanted to use for cryptocurrency transactions. I received Know Your Client ("KYC") information on the buyer for verification."
    vi. Defendant never disclosed this buyer to us, never gave KYC and AML for Saman Pazooki and had us sign an agreement and gave us documents for someone else. We never heard this name until after the funds were frozen and even then it was in passing.
    vii. Someone paid almost 7 million USD for bitcoin – that is the only thing we know for sure.
    viii. For this reason it Is our position Defendant is 'the buyer.' Defendant sent the funds. Defendant supplied the information. Defendant is the only entity with the ultimate knowledge and responsibility. Perhaps most importantly Defendant prepared and executed the agreements. In fact the agreement describes the buyer at one point as an 'investor' – stating proceeds will be distributed amongst the investor, legal consultants, consultants and brokers. Id at 5.

  b. SCOPE OF THE TRANSACTION
    i. The agreement Defendant circulated which all parties executed confirms the transaction was to total 250 bitcoins.
    ii. The agreement required seller confirm this fact and obligate itself to supply the same.
    iii. The clause states: **By this letter we confirm that we are ready, willing and able to deliver the total quantity of ₿ 250 Bitcoins from our Bitcoin provider. Id (emphasis added).** Considering this, Plaintiff Dank made a firm and binding commitment with its supplier to procure the specified quantity of Bitcoin (BTC).
    iv. Further, pursuant to paragraph 31 the full amount of the gross purchase was due and expected and not in installments.
    v. The first step of the purchase or first tranche was supposed to be $6,724,000. Id. At 6. This is in the contract prepared by Defendant and signed by all parties. The purchases would continue until the 250 bitcoins transferred in a few steps as confirmed by the parties here in the document prepared by Defendant:

14. Once the first contract was fully executed a proof of funds in the form of a screen shot of Defendants IOLTA account was provided to DANK to confirm Defendant was holding sufficient funds to pay for the first contemplated tranche. See Exhibit C.
15. At this point Dank was expecting Defendant to send over the money detailed in the Contract, about $7 million, to purchase about 200 Bitcoin for the first tranche. The contract prohibited anything less.

### CONTRACT TWO (Exhibit D)

16. The successive contracts are more riders or amendments than new contracts. Arguably each stand independent so each will be addressed independently here. The situation was fluid in reality rather than there being multiple transactions.
17. Instead of sending the full amount as planned Defendant sent about 1/3 for some unknown reason. Specifically on Friday October 27, 2023 without saying anything Defendant at the teller hand deposited the seemingly random number of $2,218,920 into my escrow:



18. Defendant circulates a letter with a new wallet address to receive the bitcoin. There are not many changes but there are some important details in this document. This letter agreement unilaterally drafted by Defendant to meet Defendant's own purpose and to satisfy its unilateral amendments is **CONTRACT TWO**. It is also a rider to contract one but it is at the same time an agreement on its own.
19. **CONTRACT TWO** *is annexed at Exhibit D and the key issues for our purposes here include:*
    a. This document confirms performance of payment related to a specific transaction and pursuant to and as part of a contemplated procedure. This is very important in light of the fact Defendant argues we do not have sufficient proof of the existence of a written contract. If there is no written contract we would argue we have an oral contract plus performance. This really is not even necessary because there are several strong and clear agreements but Defendant raises the point so it is worth responding briefly.
    b. Under New York law, the doctrine of part performance may be invoked only if plaintiff's actions can be characterized as unequivocally referable to the agreement alleged. The actions alone must be unintelligible or at least extraordinary, explainable only with reference to the oral agreement. The United States Court of Appeals for the Second Circuit (Second Circuit) held that the existence of an oral agreement must be inferred from conduct, actions that might well have been undertaken in fulfillment of the agreement but could also have been done for entirely different reasons are insufficient to prove the

existence of the agreement. Blue Ridge Invs., LLC v. Anderson-Tully Co. No. 04 Civ. 3777 (HB) (FM) (United States Southern District 2005). Here the transaction numbers and wallets and reference numbers are all identical.

c. The dollar amounts match.
d. The deals flow from one into the next.
e. Both agreements talk of 250 bitcoin and have the same transaction, reference numbers and wallet addresses. The linkage could not be more direct and linear. There can be no doubt. In any event we respectfully contend the existence of two written agreements should hopefully be self-evident in the gross amount of 250 bitcoins.
f. Next Defendant certified and affirmed the funds were free, clear, clean and of non-criminal origin. This is important as plaintiffs relied upon the due diligence, expertise, and representation of Defendant. What research was done before issuing that certification?
g. This contract TWO confirms the first round will purchase 250 bitcoin.
h. This agreement importantly confirms the next payment amount will be
i. The following tranche was promised to be for $6,205.080.00. As will be explained below yet again this does not happen for some unknown reason.
j. **Based upon the fractional payment of** $2,218,920 an equivalent amount of Bitcoin was immediately delivered to the designated wallet completing the first round without a problem:



CONTRACT THREE (Exhibit E)

20. Yet again Defendant modified unilaterally the amount and decided to send something less. This time they sent $4.5 million along with CONTRACT number 3. Note I was still in the UAE.
21. Defendant had just promised in CONTRACT TWO to send $6,205.080.00 and inexplicably and unilaterally again lowered it by 1/3. Again Defendant prepared its own agreement and sent it around via docusign.
22. What is very important here is we have a third contract on Defendant letterhead prepared and circulated by Defendant confirming the agreement of the parties with transmission of funds. It is very confusing how Defendant can argue there was never an agreement in this matter.
23. The Third Contract was similar but did not proceed as smoothly as the second. Although it seemed funds could move at first it became clear they could not. At this point my escrow had just over $4.5 million USD.
24. When I tried to move the funds through online banking an error returned. I contacted the bank and was told everything was fine and it should work and try again maybe this and maybe that. Customer service agents thought it may have been because I was on a laptop travelling from Oman to Dubai. They had me try on different WIFI. They had me purchase a device from a store, a sort of USB security key. I had to call several times and

each time was told all was well and maybe try later that day and to reboot and get on better WIFI. When I would do as the bank said I still only encountered the same error:

[Screenshot of Bank of America online transfer interface showing error message: "We were unable to process your request. Thank you for your online transfer request. Due to the amount of your transfer, please contact our Customer Service team at 1.800.933.6262 to complete your request." From: escrow ; Avail. Bal $4,511,510.55. To: coin zoom dank (BankProv). Delivery speed options shown with "Same business day, $30 fee, Wire Transfer, 5 PM ET cutoff time" selected.]

25. This went on for a day or two and at one point a banker bank suggested to try a lower amount of $500,000 and it seemed to work. The bank reversed the $500,000 and took it back and put a 'hold pending' on the entire account which remains in effect. As such the account balance shows zero available.
26. Funds were paid from Defendant as the buyer's attorney in Washington DC. Funds were represented as coming comfortably from well-seasoned accounts escrow to escrow, Bank of America to Bank of America, then to be delivered to Seller in several tranches. At each step I was provided clear written instructions.
27. In the midst of the next tranche I received a 'low-balance alert' from Bank of America by email.
28. This was the only notice or indication of any kind of an issue. When logging into online banking inexplicably there was a 'hold pending' for $4,500,000 which no one at Bank of America could explain. This appeared on November 2.
29. Bank of America would not let me move the funds after the first round. No matter what I tried or who I called the funds could not be moved. Eventually we found out why or at least we think we may know why. We have no official reason for the funds being on 'hold pending'. Plaintiffs have no official notice from the Bank or anyone else explaining why the funds are being held.
30. A few days ago the bank sent notice it has decided to close my firm's account. This is extremely unfair considering we did nothing wrong. It is also worrisome considering the funds are 'hold pending' so the future of the contested funds are uncertain.
31. Funds having nothing to do with the bitcoin transaction are also restrained wrongly.

32. The contracts have been breached by Defendant. The true identity of the buyer was concealed. The quality of the purchase funds were misrepresented detrimentally. Plaintiffs relied upon the promises and representations and agreements with Defendant and secured the requested minimum 250 bitcoins only to Defendant fail to purchase them. The dishonesty about the money, the buyer and the ability to buy breached the agreements which ironically defendant drafted and as a result, Plaintiffs have been damaged.

WHEREFORE Defendant's motion should be denied together such other relief the Court deems just and proper.

Dated:   West Islip NY
         January 9, 2024

David Grossman, Esq.
Kelly Grossman & Kerrigan LLP
*Attorneys for Plaintiffs*
1248 Montauk Highway
West Islip, NY 11795
(631) 314-4996